IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 30940-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| WILLIAM D. HARGROVE, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — William Hargrove appeals his bench trial convictions for two counts of first degree child rape, two counts of first degree child molestation, one count of second degree child molestation, and two counts of second degree child rape. On appeal, Mr. Hargrove contends (1) the trial court lacked the authority to enter findings of fact and conclusions of law based on evidence heard by a predecessor judge who presided over an RCW 10.58.090 hearing, (2) the trial court erred by admitting evidence under ER 404(b) of alleged bad acts or other crimes against an alleged victim of an uncharged sex offense, (3) insufficient evidence supports the convictions, and (4) the trial court erred by finding various counts did not constitute the same criminal conduct, which resulted in an erroneously calculated offender score. We disagree with his contentions and affirm.

FACTS

A. *Substantive facts*

William Hargrove was married to Kim Hargrove and was the stepfather of K.D.C. (D.O.B. 9/25/1989). At trial, K.D.C. testified that Mr. Hargrove sexually abused her about once a week, beginning in 1995 when she was 6, and the abuse continued until 2006, when she was 16. The sexual abuse often followed a pattern. After her mother went to work, K.D.C. entered Mr. Hargrove's bedroom, removed her clothes, and performed oral sex on Mr. Hargrove. K.D.C. testified that Mr. Hargrove touched her body and rubbed his penis on her chest and vaginal area. According to K.D.C., he would ejaculate on her stomach and chest, and then use toilet paper to clean her. Mr. Hargrove did not insert his penis, but occasionally inserted his finger, into K.D.C.'s vagina.

K.D.C. did not tell anyone about the sexual conduct when she was a child because she did not want to get Mr. Hargrove in trouble. K.D.C. cared about Mr. Hargrove and considered him a father figure. She did not know Mr. Hargrove similarly abused her younger sister, G.H.

At trial, the court also heard testimony concerning an uncharged sexual assault against R.L. (D.O.B. 10/8/1985). R.L. lived in Cheney in the same trailer park as Mr. Hargrove, K.D.C., and G.H. R.L. testified about one sexual abuse incident with Mr.

2

Hargrove when she was 10 years old and in the fourth grade. She testified that she went to Mr. Hargrove's home to see if her friend K.D.C. could play. Mr. Hargrove answered the door, said that K.D.C was not there, but told R.L. that he wanted to speak with her. R.L. went inside, feeling nervous. She testified, "I was really nervous at that point. I didn't want to go, and so I was kind of like trying to get away—he was holding me by my arm—and trying to leave, but he wouldn't let me." Report of Proceedings (RP) (Jan. 10, 2012) at 438. He took her to the bedroom, placed her on his bed, and removed her pants and shirt. According to R.L., Mr. Hargrove touched her chest, breasts, stomach, and vagina.

After Mr. Hargrove was done, he threatened to kill R.L.'s family if she told anyone about the incident. R.L. ran home but did not tell anyone what happened. One year later, R.L. told her sister about the incident, and the sister told their father and mother. Six years later, after she underwent counseling, R.L. reported the incident to the police. No criminal charges, however, were filed.

G.H., Mr. Hargrove's biological daughter (D.O.B. 9/16/94), lived in the Cheney trailer park with her mother (Ms. Hargrove), Mr. Hargrove, and K.D.C. Mr. Hargrove began sexually molesting G.H. when she was five or six. The abuse of G.H. followed a pattern similar to the molestation of K.D.C. Mr. Hargrove directed G.H. to enter his

3

bedroom. After she entered the room, Mr. Hargrove removed G.H.'s shirt, underwear, and socks. He also took off his underwear and shirt. With G.H. on the bed, Mr. Hargrove touched her stomach, chest, and vaginal region. Mr. Hargrove went to the bathroom and retrieved a roll of toilet paper. He returned with his penis in his hand. According to G.H., Mr. Hargrove penetrated her vagina with his penis and fingers. Mr. Hargrove attempted to place his penis in G.H.'s mouth, but she refused. Mr. Hargrove would ejaculate on her back, belly button, and inside her and then use the toilet paper to clean himself and G.H.

G.H. testified that the sexual contact first took place every two weeks and later every week. The incidents stopped when she was 13 years old and went to visit her mother in Maine in July 2008. On August 2, 2008, while in Maine, she wrote a note to her mother telling her about the sexual abuse.

On August 25, 2008, the State charged Mr. Hargrove with first degree child rape of G.H. (count 1), first degree child molestation of G.H. (count 2), second degree child rape of G.H. (count 3), second degree child molestation of G.H. (count 4), first degree child rape of K.D.C. (count 5), first degree child molestation of K.D.C. (count 6), and first degree rape of G.H. (count 7).

4

B. *Procedural facts*

Judge Annette Plese, who did not preside over the trial, presided over a pretrial hearing for the purpose of determining whether the incident involving R.L. was admissible under RCW 10.58.090. That statute admits evidence of prior sex offenses committed or alleged to have been committed by a defendant currently charged with a sex offense. At the hearing, Judge Plese heard testimony from R.L.; Melonie Strey, R.L.'s sister; Martin L., R.L.'s father; and Terry Thompson, a private investigator who was present as a witness at an interview with R.L.

Judge Plese found the incident involving R.L. admissible under RCW 10.58.090 and entered an order allowing the evidence. Judge Plese did not consider ER 404(b) as an alternative ground for admitting the evidence. Subsequently, in *State v. Gresham*, 173 Wn.2d 405, 413, 269 P.3d 207 (2012), the Supreme Court ruled that RCW 10.58.090 was unconstitutional under the separation of powers doctrine because it conflicted with ER 404, a rule of court procedure. This case was stayed by the trial court for one and one-half years pending the decision in *Gresham*.

*Gresham* was issued two business days before the opening day scheduled for trial. On January 6, 2012, during a pretrial hearing before Judge Greg Sypolt, the State changed strategy and moved under ER 404(b) for admission of the incident involving

5

R.L. During the pretrial hearing, Mr. Hargrove objected to introduction of the incident involving R.L. on the ground that he was given insufficient notice of the State's intent to use such evidence under ER 404(b). The State contended that Mr. Hargrove had already received full disclosure of the evidence relevant to an ER 404(b) motion and noted that a factual hearing concerning R.L.'s alleged abuse had already occurred. The State requested to go forward with an ER 404(b) hearing during the pretrial conference. Judge Sypolt found no prejudice to Mr. Hargrove with proceeding with an ER 404(b) hearing because the testimony relevant to the hearing was heard two years earlier. Nonetheless, Judge Sypolt continued the pretrial hearing until the morning of the first day of trial, January 9, 2012.

After Judge Sypolt's initial ruling, Mr. Hargrove attempted to establish that Judge Plese previously addressed whether R.L.'s testimony should be admitted under ER 404(b). He asserted that Judge Plese had excluded the evidence on the basis of ER 404(b). Mr. Hargrove's trial counsel argued:

> And, Your Honor, [Judge Plese] was the one that heard the testimony and looked at the evidence and everything else, and so—I guess, people's credibility and those type of things and made that decision [of not admitting under ER 404(b)]. I'm not sure what you plan on doing with the hearing or have testimony. But anyway, I leave it up to you.

RP (Jan. 6, 2012) at 287.

6

At the end of the January 6 pretrial hearing, Judge Sypolt repeated his ruling that he would entertain the State's ER 404(b) motion. Mr. Hargrove, through counsel, asked the court if he could present evidence at the ER 404(b) hearing. The court granted the request. The prosecutor then advised the court that he "had not intended to bring [R.L.] for such a hearing. I intended to ask you to consider her previous testimony." RP (Jan. 6, 2012) at 288. The court responded, "I have the previous testimony of [R.L.]. It's of record. My view would be that there's no need for testimony." RP (Jan. 6, 2012) at 288-89. Mr. Hargrove and his counsel remained silent.

At the continued pretrial hearing, the State moved to admit evidence of the R.L. incident under ER 404(b). The State argued the evidence was necessary to rebut Mr. Hargrove's defense that his stepdaughter and daughter fabricated the allegations, stating, "It is important that there is a complainant other than a family member." RP (Jan. 9, 2012) at 296-97. The State argued that unlike G.H. and K.D.C., who Mr. Hargrove complained conspired with his ex-wife, R.L. had no similar motive to fabricate.

Mr. Hargrove did not call any witness during the hearing. Defense counsel argued against the motion but did not object to the trial court's reliance on testimony heard by Judge Plese during the June 2010 RCW 10.58.090 hearing. The court admitted the R.L. incident under ER 404(b) to show a common scheme or plan. In its oral decision, the

7

No. 30940-1-III
*State v. Hargrove*

court stated, in part:

> [S]imilar acts of sexual abuse of children are generally very probative of a common scheme or plan and the need for such proof is unusually great in child sex abuse cases . . . . And, again, the high probative value arises because of, again, secrecy surrounding child sex abuse, vulnerability of alleged or actual victims, the, again, frequent absence of physical evidence to bolster an inference that child sexual abuse has occurred, the public opprobrium connected to such allegations and accusations, a victim's unwillingness to testify, which may very well appear counterintuitive to some, nonetheless that is a factor that courts have identified, and difficulty with determining credibility of a child witness.

RP (Jan. 9, 2012) at 306-07.

In its written conclusions, the court applied a four-part test to determine whether evidence of R.L.'s uncharged incident should be admitted under ER 404(b). First, the court had to determine whether the uncharged incident occurred, based on the preponderance of the evidence. Here, the court found by a preponderance of the evidence that the uncharged incident occurred. Second, the court had to determine the purpose for admitting the evidence. The court determined that the purpose for admitting the uncharged incident was to show a common scheme or plan.

Third, the court had to determine that the uncharged incident related to an issue in the case, e.g., common scheme or plan, and that admitting evidence of the misconduct made the existence of a common scheme or plan more likely. The court further determined that "[u]niqueness is not required for a common scheme or plan, rather, only

8

common features and a substantial degree of similarity are needed." Clerk's Papers at 1911. The court noted the following common features between the uncharged incident and the charged incidents: (1) Mr. Hargrove gained a position of trust with R.L., similar to the trust he gained with K.D.C. and G.H., and exploited that trust to isolate all three girls away from public view, (2) the abuse with R.L. occurred at Mr. Hargrove's home, the same location Mr. Hargrove used with K.D.C. and G.H., (3) all three girls were approximately the same age when the abuse occurred, and (4) all three girls were made to undress and then Mr. Hargrove touched their private parts with his hands or his penis.

Fourth, the court had to determine whether the probative value of the uncharged incident outweighed the prejudice to Mr. Hargrove. Here, the court found that R.L.'s testimony had great probative value to show a common scheme or plan, and this value substantially outweighed the prejudice to Mr. Hargrove.

At trial, Mr. Hargrove's theory was that his ex-wife, Ms. Hargrove, despised him and wanted to avoid paying child support. Mr. Hargrove contended that Ms. Hargrove cajoled K.D.C. and G.H. to accuse him of sexual abuse so she could obtain custody of the girls, which she did not have when she left the marriage and went to Maine.

C. *The trial court ruling*

The court, in part, summarized the evidence as follows:

9

[T]the Court observes and recognizes that the defense theme here is that of a conspiracy, and that is, in essence, that the mom, Kimberly Hargrove, enlisted the aid and cooperation of her daughters, [K.D.C.] and [G.H.], to accomplish some things, one of which was to obtain—reobtain custody of [G.H.] in Maine and thereby reduce [her] child support obligation. And as part of this, there was encouragement or pressure put upon the two daughters to fabricate allegations of sexual abuse. And it turns out the allegations went back a number of years.

Additionally, another motivation for the conspiracy may have been to exact some sort of revenge on the defendant. It is clear that Kimberly Hargrove has great animus towards the defendant, doesn't like him in the least bit, hates him, despises him—any of those verbs will do—and that also as a part of the conspiracy it's urged that the mom, Kimberly, encouraged or cajoled [K.D.C.] to have her former friend, [R.L.], essentially support the sexual abuse allegations of [G.H.] and [K.D.C.] with her own allegations, as indicated, from 1995 when [R.L.] was about ten years or so old.

. . . .

Also, there's a theme among the other aspects of the conspiracy that Kimberly Hargrove actually abandoned the girls and really wasn't interested in reducing or eliminating child support, perhaps getting credits back for child support that she allegedly owed to defendant. And this is supported by, mainly, court documents as testified by counsel Mr. Rick Kayne.

There's also reference to the Xanga entries which, as indicated, are essentially postings online which portray, for those interested in cyberspace, what [K.D.C.] was thinking or what experiences she was having at a particular time. And, it's urged that, since [K.D.C.] had said nothing bad about her stepfather, the defendant, that that absence of negative entries supports the fact that nothing happened of the sort alleged by [K.D.C.].

RP (Jan. 25, 2012) at 1157-61.

The trial court emphasized the R.L. incident:

Now, next, there was the testimony by [R.L.] who, just to describe her in general, she now is a young woman of about 26 years of age. Again, her birth date is in October of 1985. She now has a master's degree. She is a social worker for the State of Washington. . . .

. . . .

The sexual touching [of R.L.] went on for a time. When it finished, defendant allegedly told [R.L.], "Don't tell or I'll kill your family," or, "Even if I don't, my dad is a legal expert and he will get me out of trouble." And the Court noted very well and it's memorable that [R.L.] was very tearful; she was emotional on the witness stand. She described running from the trailer as fast as she could and wanting to tell somebody about this but was afraid because of what she said the threat was, that she couldn't tell anybody right away. And, in fact, she emphasized her desire to tell somebody by indicating five times, "I really wanted to tell"—"really, really, really, really, really"—and all the while on the witness stand being very upset and having difficulty with the testimony that she was providing. So the Court did find this testimony, again, for the limited purpose outlined, to be persuasive, impactful, and credible, without any question about it.

RP (Jan. 25, 2012) at 1168-69.

The court weighed the credibility of the victim witnesses against the defense theory of conspiracy, and found the latter as ultimately not making sense:

And the final analysis of all these numerous factual assertions kind of boils down to some fairly simple things, and that is, on the one hand there's the alleged conspiracy; on the other hand, there are the allegations. And so the question arises, if, as the Court has found, that, in terms of the allegations themselves, the alleged victims are credible and persuasive, the question does arise, why would these alleged victims make up such horrendous stories and allegations. So it's—it really doesn't make sense, and particularly when you construe or when you look at other comments that were made in the testimony; that is, that each of the alleged victims were very circumspect about what they were saying during their testimony; they became emotional, teary-eyed on occasion, and also from [K.D.C.]'s

11

point of view, she says that she did care about Mr. Hargrove and really
didn't want to see him get in any trouble.

RP (Jan. 25, 2012) at 1175-76. The trial court found Mr. Hargrove guilty of counts 1

through 6 as charged, acquitted him of count 7 of first degree rape, but found him guilty

of the lesser included offense of second degree child rape.

At sentencing, the trial court found counts 3 and 7 "coterminous" and therefore

sentenced Mr. Hargrove only on count 3. RP (May 11, 2012) at 1222. Mr. Hargrove

argued that some of the charges were based on the same criminal conduct and therefore

his offender score should be a 6, rather than 9+. The trial court rejected this argument

and sentenced Mr. Hargrove, under RCW 9.94A.507, to a minimum term of 240 months

and a maximum of life on count 1, a minimum of 149 months and a maximum of life on

count 2, a minimum of 210 months and a maximum of life on count 3, a minimum term

of 87 months on count 4, a minimum term of 210 months on count 5, and a minimum

term of 149 months on count 6.

## ANALYSIS

A.    *Whether the trial court erred in relying on testimony taken before a different judge
      in its finding that the R.L. incident was admissible under ER 404(b)*

Mr. Hargrove first argues that the trial court erred by admitting evidence under

ER 404(b) of other alleged bad acts against R.L. Citing *State v. Bryant*, 65 Wn. App.

12

547, 549, 829 P.2d 209 (1992), he argues that Judge Sypolt, the successor judge, did not

have the authority to enter findings of fact and conclusions of law based on evidence he

did not hear at the RCW 10.58.090 hearing before Judge Plese, the predecessor judge.

The record shows no objection by Mr. Hargrove to Judge Sypolt's use of

testimony from the RCW 10.58.090 hearing before Judge Plese. However, Mr. Hargrove

identifies the following passage from the pretrial hearing as his objection:

> And, Your Honor, she [Judge Plese] was the one that heard the testimony
> and looked at the evidence and everything else, and so—I guess, people's
> credibility and those type of things and made that decision.

RP (Jan. 6, 2012) at 287.

When read in context, it is apparent that Mr. Hargrove's counsel was arguing that

Judge Plese had already ruled the R.L. incident inadmissible under ER 404(b). Counsel's

comment was not intended to be an objection to the use of testimony heard by Judge

Plese. In his reply brief, Mr. Hargrove omits the two sentences uttered by defense

counsel immediately after the quoted sentence, in which counsel remarked, "I'm not sure

what you plan on doing with the hearing or have testimony. But anyway, I leave it up to

you." RP (Jan. 6, 2012) at 287. These additional comments suggest that Mr. Hargrove

consented to Judge Sypolt either entertaining new testimony or relying on the previous

RCW 10.58.090 testimony.

13

A further reading of the January 6 pretrial hearing and the January 9 trial transcript establishes Mr. Hargrove's failure to object. At the end of the January 6 pretrial hearing, Judge Sypolt repeated that he would entertain the ER 404(b) motion on Monday morning. As indicated above, Mr. Hargrove asked the court if he could present evidence at the ER 404(b) hearing and the court granted the request. Moreover, during this hearing, the court clearly stated, "[T]here's no need for [R.L.'s] testimony." RP (Jan. 6, 2012) at 288-89. Mr. Hargrove and his counsel remained silent despite the judge's explicit comment that he planned to rely on the earlier hearing testimony of R.L. Additionally, during the ER 404(b) hearing, Mr. Hargrove's trial counsel argued against the motion but did not object to the trial court's reliance on testimony elicited during the RCW 10.58.090 hearing.

It is well settled that, in general, appellate courts will not entertain issues raised for the first time on appeal. RAP 2.5(a); *Brundridge v. Fluor Fed. Servs., Inc.*, 164 Wn.2d 432, 441, 191 P.3d 879 (2008); *see also* RAP 9.12. The reason for this rule is to afford the trial court an opportunity to correct errors, thereby avoiding unnecessary appeals and retrials. *Smith v. Shannon*, 100 Wn.2d 26, 37, 666 P.2d 351 (1983). One exception to this rule is a party's assertion of "manifest error affecting a constitutional right." RAP 2.5(a)(3). Mr. Hargrove does not claim any manifest error affecting a constitutional

right. Thus, we are not obligated to address the issue. However, even if we address the issue, Mr. Hargrove's argument fails.

Generally, a successor judge lacks authority to enter findings of fact on the basis of testimony heard by a predecessor judge. *DGHI, Enters. v. Pac. Cities, Inc.*, 137 Wn.2d 933, 977 P.2d 1231 (1999); *In re Marriage of Crosetto*, 101 Wn. App. 89, 95, 1 P.3d 1180 (2000). Case law and court rules set forth the rule that a successor judge has the authority only to do acts that do not require finding facts. *Crosetto*, 101 Wn. App. at 96. Only the judge who has heard evidence has the authority to find facts. *Id.*; *Bryant*, 65 Wn. App. at 550. Nevertheless, the parties may agree to allow a successor judge to make findings of fact based on the evidence in the record. *Crosetto*, 101 Wn. App. at 96.

Mr. Hargrove's reliance on *Bryant* is misplaced. In *Bryant*, a juvenile defendant pleaded guilty to two counts of theft. The juvenile court judge found a manifest injustice and imposed an exceptional commitment of 21 to 28 weeks. *Bryant*, 65 Wn. App. at 548. At the end of his oral decision, the trial court directed the State to prepare written findings consistent with his oral decision. The judge subsequently retired. Later, a court commissioner signed the findings of fact and conclusions of law in support of the disposition. The juvenile appealed the disposition on the ground that the facts did not support a manifest injustice finding and moved to strike the findings and conclusions on

15

the ground that they were not signed by the original judge. *Id.*

On appeal, the *Bryant* court addressed whether the findings of fact and conclusions of law on the manifest injustice disposition must be stricken because they were signed by a judge other than the disposition judge. *Id.* at 549. There was no indication in the record as to the procedure used by the commissioner, i.e., whether he reviewed the evidence presented at the disposition hearing or the judge's oral decision, or whether he merely signed the findings and conclusions as presented by the State. This court, nonetheless, ruled that the commissioner was without authority to sign the findings and conclusions under any procedure. *Id.* The decision, however, does not disclose whether the defendant agreed to the form of the findings or agreed to someone other than the judge signing the findings.

*Bryant* has significant differences to our case. Judge Sypolt reviewed the previous testimony of R.L. He noted on the record his review of the testimony, and Mr. Hargrove did not object to his review of prior testimony rather than entertaining new live testimony. Judge Sypolt allowed Mr. Hargrove to present live testimony, but Mr. Hargrove decided otherwise. Finally, Judge Sypolt entered his own findings of fact rather than signing findings prepared for the previous judge.

*Crosetto* is more helpful. In *Crosetto*, Division Two of this court affirmed a

substitute trial judge's findings of fact on remand of a divorce suit based on evidence from the first trial conducted by a first judge. *Crosetto*, 101 Wn. App. at 96. While the case was first on appeal, the original judge retired, and the parties agreed to allow a successor judge to make the necessary determinations based on the record from the first trial. The successor judge determined that he could render findings without engaging in credibility determinations. *Id.* at 94. After agreeing to the procedure, Laurel Crosetto appealed from the successor judge's findings, arguing that she was entitled to a new trial and that the trial court abused its discretion in making its findings. The court disagreed. The court observed that no Washington law prohibited the parties from agreeing to a substitute judge entering findings. *Id.* at 96.

Here, the State correctly asserts that Mr. Hargrove stipulated with the State to the trial court's consideration of the evidence developed at the RCW 10.58.090 hearing in lieu of testimony of those witnesses at trial. The trial court even conducted a colloquy with Mr. Hargrove regarding the stipulated evidence as constituting a waiver of his right of confrontation. Mr. Hargrove agreed to the stipulation. The reasonable inference from such a record is that the parties agreed that the trial court could rely on the record created by the predecessor judge in rendering its decision regarding admissibility under ER 404(b).

17

B.    *Whether the trial court erred when it admitted the R.L. incident under ER 404(b)*

Next, Mr. Hargrove contends that even if the trial court had the authority to enter findings of fact supporting its order admitting ER 404(b) evidence of the R.L. incident, the court erred because this evidence was inadmissible. Citing *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003), Mr. Hargrove argues that the trial court must presume evidence of prior bad acts is inadmissible and decide in favor of the accused when the case is close. He contends that the State did not prove a common scheme or plan because the acts were not sufficiently similar to indicate design. Specifically, he argues that there is a substantial difference between the allegations of Mr. Hargrove's daughters and the allegations of R.L. He argues that he was not in a position of trust with R.L., who was not a family member, and that R.L.'s testimony shows that Mr. Hargrove had not gained her trust and that R.L. felt uneasy around him the day of the incident. He also asserts that the one incident in 1995 with R.L. did not involve any grooming or design or pattern to gain her trust. Rather, it was a crime of opportunity and did not demonstrate any scheme or plan to molest children.

ER 404(b) controls evidentiary rulings concerning other wrongful conduct of a defendant. ER 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It

18

may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

ER 404(b) should be read with ER 403, which provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

This court reviews de novo the trial court's legal interpretation of ER 404(b). *State v. Fisher*, 165 Wn.2d 727, 745, 202 P.3d 937 (2009). When the trial court correctly interprets ER 404(b), this court reviews the trial court's admission of prior misconduct for an abuse of discretion. *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). When a trial court's exercise of its discretion is manifestly unreasonable or based on untenable grounds or reasons, an abuse of discretion exists. *Id.*

The trial court begins with the presumption that evidence of prior misconduct is inadmissible. *DeVincentis*, 150 Wn.2d at 17. However, such evidence may be admissible for purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Powell*, 126 Wn.2d at 258. Before the trial court admits evidence of prior misconduct under ER 404(b), it must engage in a four-part analysis and (1) find by a preponderance of the evidence that the

19

prior misconduct occurred, (2) identify the purpose for admitting the evidence, (3) determine the relevance of the evidence to prove an element of the crime or to rebut a defense, and (4) weigh the probative value of the evidence against its prejudicial effect. *State v. Lough*, 125 Wn.2d 847, 852, 889 P.2d 487 (1995); *Fisher*, 165 Wn.2d at 745; *DeVincentis*, 150 Wn.2d at 17.

The trial court must conduct the ER 404(b) analysis on the record. *State v. Asaeli*, 150 Wn. App. 543, 576 n.34, 208 P.3d 1136 (2009). A record facilitates appellate review and ensures that the trial judge carefully considered the issue. *State v. Pirtle*, 127 Wn.2d 628, 651, 904 P.2d 245 (1995).

*Gresham* is helpful. The *Gresham* court, as previously noted, declared RCW 10.58.090 unconstitutional. Nevertheless, the court upheld the defendant's convictions for child molestation, despite the jury hearing evidence of prior molestations. The court held that under ER 404(b), the trial court did not abuse its discretion by admitting evidence of prior sexual offenses to establish a common plan or scheme. All of the victims were of a similar age and size when the defendant began molesting them. *Gresham*, 173 Wn.2d at 422-23. Furthermore, in each instance, the defendant was a trusted relative or friend of the girl, and in each case the defendant molested the girls in similar ways.

20

As detailed above, the trial court analyzed all four of the ER 404(b) factors. The findings of fact arguably support the conclusions of a common scheme or plan. All girls lived in the same trailer park and were of similar young age when they were molested. Mr. Hargrove arguably had a position of trust with each. Mr. Hargrove took each girl onto his bed and touched each of them all over the front of their bodies.

But even if the evidence was insufficient to prove a common scheme or plan, the court's admission of the evidence may be affirmed on any ground adequately supported by the record. *State v. Costich*, 152 Wn.2d 463, 477, 98 P.3d 795 (2004). Here, the State argued that the R.L. incident was admissible to rebut Mr. Hargrove's conspiracy defense. The evidence undermined Mr. Hargrove's contention that Ms. Hargrove directed her daughters to fabricate the story of child molestation. Indeed, R.L. told her sister, her parents, and a counselor that she had been molested long before G.H. or K.D.C. ever made their complaints against Mr. Hargrove public. The trial court did not abuse its discretion in admitting the R.L. incident based on common scheme or plan. Alternatively, the evidence was admissible to rebut Mr. Hargrove's conspiracy defense. *Lough*, 125 Wn.2d at 852.

C.     *Whether the evidence was sufficient to convict Mr. Hargrove of all charges*

The standard for evaluating the sufficiency of the evidence to support a verdict is

21

whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could find that each element of the offense has been proved beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980). In reviewing the sufficiency of the evidence in a criminal case, the reviewing court must draw all reasonable inferences from the evidence in favor of the State and interpret those inferences most strongly against the defendant. *State v. Verda Lopez*, 79 Wn. App. 755, 768, 904 P.2d 1179 (1995); *State v. Hagler*, 74 Wn. App. 232, 235, 872 P.2d 85 (1994). Questions of credibility are determined by the trier of fact. *State v. Fiser*, 99 Wn. App. 714, 719, 995 P.2d 107 (2000). Application of that standard requires affirming the separate convictions found by the trial court pursuant to the verdicts rendered.

Mr. Hargrove argues that the evidence was insufficient to support the convictions because the court explicitly deemed the defense conspiracy theories "plausible." He reasons that because "plausible" is defined in the 4th edition of the *American Heritage Dictionary* (2001) as "credible," it follows that "the court could not have found guilt beyond a reasonable doubt because it's finding the defense credible was sufficient reason to prevent the State from meeting its high burden." Br. of Appellant at 23. His argument fails.

Although the trial court found that Mr. Hargrove advanced "plausible defense

22

theories," it does not follow that the court considered these theories more persuasive than the victims' testimonies. The trial court did not necessarily choose the word "plausible" because of its dictionary definition. More importantly, the trial court could have believed the testimonies of the victims while also believing that Ms. Hargrove despised Mr. Hargrove, wanted to avoid child support payments, and encouraged her daughters to report the abuse.

The trial court heard ample evidence to support each of the seven convictions. The evidence included G.H.'s testimony that Mr. Hargrove was more than three years older than she and they were never married. The sexual abuse began in Washington State when she was 5 or 6 years old. The sexual abuse initially occurred every two weeks, then increased to weekly, and ceased when she visited her mother in Maine when she was 13 years old. In the beginning, Mr. Hargrove touched her stomach, chest, and vaginal region. Later, he penetrated G.H. with his fingers and penis. Throughout, Mr. Hargrove ejaculated either on or inside G.H. This testimony supports a finding beyond a reasonable doubt of guilt of first degree child rape, first degree child molestation, second degree child molestation, and second degree child rape.

K.D.C. testified that Mr. Hargrove was more than three years older than she and they were never married. The sexual abuse started when she was in kindergarten. The

sexual abuse included oral sex, masturbation, and penile contact with and digital penetration of her vaginal area. The sexual abuse occurred at least once a week. Mr. Hargrove first sexually abused K.D.C. when she was 6, and the abuse continued until she was 16. K.D.C. testified that her performing oral sex on the defendant was on such a regular basis that it was like doing a "chore." RP (Jan. 9, 2012) at 361-62. This testimony supports a finding beyond a reasonable doubt of guilt of first degree child rape, first degree child molestation, second degree child molestation, and second degree child rape.

D. *Whether the trial court erred in determining that various charges did not constitute the same criminal conduct*

A trial court's determination of what constitutes the same criminal conduct for purposes of calculating an offender score will not be reversed absent an abuse of discretion or misapplication of the law. *State v. Tili*, 139 Wn.2d 107, 122, 985 P.2d 365 (1999). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. *State v. Mehrabian*, 175 Wn. App. 678, 710, 308 P.3d 660, *review denied*, 178 Wn.2d 1022, 312 P.3d 650 (2013).

RCW 9.94A.589(1)(a) provides:

Except as provided in (b) or (c) of this subsection, whenever a person is to be sentenced for two or more current offenses, the sentence range for each current offense shall be determined by using all other current and prior

24

convictions as if they were prior convictions for the purpose of the offender score: PROVIDED, That if the court enters a finding that some or all of the current offenses encompass the same criminal conduct then those current offenses shall be counted as one crime.

"A court will consider two or more crimes the 'same criminal conduct' if they: (1) require the same criminal intent, (2) are committed at the same time and place, and (3) involve the same victim." *State v. Price*, 103 Wn. App. 845, 855, 14 P.3d 841 (2000). All three prongs must be met. *State v. Vike*, 125 Wn.2d 407, 410, 885 P.2d 824 (1994). The legislature intended that courts construe RCW 9.94A.589(1)(a) narrowly to thereby disallow most assertions of same criminal conduct. *State v. Wilson*, 136 Wn. App. 596, 613, 150 P.3d 144 (2007).

Mr. Hargrove contends the trial court erred in finding that counts 1 and 2 did not constitute the same criminal conduct, counts 3, 4, and 7 did not constitute the same criminal conduct, and counts 5 and 6 did not constitute the same criminal conduct, thus resulting in an improper offender score of 9+, rather than 6. He argues that counts 1 and 2 involved the same time period and place and involved the same victim, and that his intent did not change from one crime to another. He also maintains that the intent was the same and the only thing different was the circumstance that led one crime to another.

His arguments are unavailing. Although counts 1 and 2 involved the same victim, there was testimony as to numerous assaults that did not necessarily occur at the same

25

time. The discrete crimes of child molestation and child rape have different statutory intent elements. *State v. Saiz*, 63 Wn. App. 1, 4, 816 P.2d 92 (1991). Child molestation includes the element of sexual contact, which requires proof that the contact was made for the purpose of sexual gratification. *Id.* However, child rape is a strict liability offense because it has no mens rea element that requires proof of knowledge or intent. *State v. Deer*, 175 Wn.2d 725, 731, 287 P.3d 539 (2012). Child rape statutorily requires sexual intercourse, yet not necessarily sexual gratification. *Saiz*, 63 Wn. App. at 4. Therefore, the first prong of the similar conduct is also not met.

Counts 3 and 4 are respectively second degree child rape and second degree child molestation of G.H. Count 7 is a second degree child rape of G.H. The same different intent analysis applies to Mr. Hargrove's argument here that applied to his argument concerning counts 1 and 2, above. Moreover, the charging period is not the same as that for counts 3 and 4. Accordingly, the trial court properly exercised its discretion to find the crimes were separate conduct.

Counts 5 and 6 are respectively first degree child rape and first degree child molestation of K.D.C. The same analysis applies here as applied to Mr. Hargrove's argument that count 1 and 2 constituted the same criminal conduct. Accordingly, the trial

26

court properly exercised its discretion to find the crimes were separate conduct and appropriately calculated the offender score as a 9+.

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

Pursuant to Mr. Hargrove's request, this court granted Mr. Hargrove an extension to file a statement of additional grounds. Mr. Hargrove did not file a statement.

We affirm the trial court in all respects.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, J.

WE CONCUR:

Korsmo, J.

Fearing, J.

27